## H. W. JONES v. W. KEITH AND OTHERS.

1. It is competent for the Legislature to authorize the erection of a toll-bridge at the crossing of a stream by a public highway, without compensation to the riparian owners; and it is immaterial that the riparian owners are operating a ferry at the crossing, and that its value will be impaired by the bridge.

2. If a bridge spans a stream at the crossing of a highway, and within the limits of the highway, it is to be regarded as part of the highway; and a legislative charter for the erection of such a bridge imposes no new servitude on the land of the riparian owners, and entitles them to no compensation.

APPEAL from Titus. Tried below before the Hon. J. D. McAdoo.

The opinion states the material facts. The defendant, Jones, claimed no interest in the land, and his charter made no provision to compensate the owners of it.

*B. W. Gray* and *W. J. Sparks,* for the appellant.

*Culberson & Mabry,* for the appellees. Appellees are riparian owners. They own the land on both sides of the Sulphur at Becknell's Crossing. The exclusive right of the ferry at this place belongs to them. It is a general principle of univer-

sal application, that private property cannot be taken for public use, without just compensation. If it be conceded that the toll-bridge and turnpike, authorized by the act in question, are designed as a public use, and if they amount to a conversion of the land and crossing to such use, such appropriation, without adequate compensation to the appellees for their property, cannot be maintained. The right of ferry, secured to the appellees as riparian owners, is private property within the meaning of the Constitution, and cannot be invaded or impaired, or taken for public use, without just compensation, while this right or property is secured by law to the owners of the land, and is appurtenant to the soil. The owner holds this right by a title as sacred and high as the one by which he holds the land from which it emanates. The attempt upon the part of the Legislature to transfer this right to appellant, without the consent of appellees, is inoperative and futile. The legislative authority of this State cannot, by any other mode than that prescribed by the Constitution, divest appellees of this right. The Legislature may divest appellees of this right for the public benefit, upon just compensation. The rights of riparian owners, under our law, are the same " upon any water-" course, navigable stream, lake, or bay," in regard to ferry privileges. (Oldham & White's Digest, Article 909 ; McManus v. Carmichael, 5 Law Register, page 593 ; Bowman v. Nathan, 2 McLean, C. C., 376 ; Lehigh Valley R. R. v. Trono, 28 Penn. State Reports ; Paschal's Annotated Constitution, page 259 ; Morgan v. King, 18 Barb., p. 277.)

We insist, with due respect for the Legislative Department of the government, that the charter to appellant does not comply with the constitutional requirements. It fails to make any provision whatever for adequate compensation to the owners of the property which by it the corporators are authorized to take. The pleadings show that for many years there has been a public crossing at Becknell's, on the Sulphur. Appellees, their ancestors and vendors, for nearly twenty years before this act was passed, had used and enjoyed their rights at said

crossing, by keeping first a bridge and then a ferry across this stream. This was a valuable right to appellees, producing an annual income of eight hundred dollars. Doubtless, the income and emoluments expected to be derived from these riparian rights induced the original and subsequent purchases of these lands. Yet, the act in question attempts to transfer this valuable right to appellant, without a provision for immediate or prospective compensation. The taking of private property and the compensation therefor should be concurrent acts. The owner should not be left to his redress by a suit at law, even in cases where ultimate judgment of damages was certain. This is not an open question in our courts. The Supreme Court in the case of the B. B. Brazos and Colorado R. R. Co. *v.* Ferris, 26 Texas, 601, settles the law on this subject.

It is insisted by the appellant that the case of East Hartford *v.* Hartford Bridge Co., 10 Howard, U. S., 533, is opposed to the view we take of appellees' rights as riparian owners. Such is not our construction of that case. The town of East Hartford, by a law of the Legislature, was authorized to own and operate a ferry across the stream; subsequently the Legislature passed an act authorizing the Hartford Bridge Co. to construct, own, and operate a bridge over the stream at or near the ferry. It was held that the Legislature was not precluded by the former act, but might well pass the latter act. It will be noted that the town of East Hartford did not claim the ferry as a right which emanated from the land. The town was not the owner of the land, but held the ferry privilege alone, by virtue of a special act of the Legislature. It was competent for the Legislature to repeal this act. (Charles River Bridge *v.* Warren Bridge and others, 11 Peters, 496.)

It will be perceived, from the pleadings in this case, that a public county road had been established for many years, and continuously used, crossing the Sulphur stream at Becknell's.

The appellees are the owners of the land over which this road runs. They hold the fee, while the public, at the time the act in question was passed, and for a long time before, had

an easement over it. Are the appellees entitled to compensation for any injury they may sustain by converting the public county road into a turnpike? The charter authorizes the appellant to bridge the stream, and to turnpike, by embankments of earth, the bottom and low lands on either side of the stream. This is a severe servitude to impose on the land of a citizen. It appropriates the banks where the road crosses the stream, for twenty-five years, and for the same length of time devotes a space embraced by the road to the burden and servitude of a turnpike across the low lands of the stream.

It may be said that the owners of the soil were compensated for this easement of the public, when the county road was laid out and established. We do not so regard it. The use sought to be made of the land by this charter was not contemplated by the owners of the soil, or by the County Court of Titus and Lamar counties, when this road was established. Such action by the County Courts is always with reference to an easy method of changing routes, altering grades, uncertain duration, and of entire abandonment, and superficial embankments, and without reference to miles of embankments impeding the flow of water, and causing the inundation of many acres of land, and an appropriation and use of the land for an exclusive use and benefit for a quarter of a century. It will not be denied that the owners of land at such localities usually waive their rights to damages in consequence of anticipated benefits from the proposed road. In this case the profits expected to be derived from the ferry privilege constituted a sufficient inducement for the owners of the soil to waive any damages that may have arisen from the county road; and doubtless, in this case, as in all others of a similar character, the action of the County Court and the owners of the land was taken with reference to this right. (Redfield on the Laws of Railways, page 331, and note; Williams v. Natural Bridge Plank Road Co., 21st Missouri, 480; Rail Road ex-parte, 2 Rich., 434; Plank Road v. Buffalo etc., 20 Barb., 644.)

It is now settled law in New York, though formerly held

otherwise in that State, that the dedication, on the establishment of a highway by any legal mode, does not authorize a railroad company to take it for their track, without compensation to the owner of the fee, although done by an act of the Legislature. (Williams *v.* The Central New York Railway, 16 Smith's N. Y. Court of Appeals, 97; Crawford *v.* De-Laune, 7 Ohio State Reports, 459; Cincinnati, etc., Railway Co. *v.* Cummingsville, 14 Ohio State Reports, 523; Redfield on the Law of Railways, Vol. I., title Eminent Domain, page 300.)

*Dillahunty & Mitchell,* also for the appellees.

WALKER, J.   The appellees have enjoined, in the District Court, the appellant, from building a toll-bridge across the Sulphur Fork of Red River.   They allege in their petition that they are the owners in fee of the land on both banks of the river, where the appellant proposes to erect the bridge, and that the appellant has no right to build the bridge at the place designated and known as McCrury's Crossing.

The appellant, in his answer, pleads an authority under a special act of the Legislature, granting to him and his associates a franchise to construct and keep up a toll-bridge, for the period of twenty-five years, at the point designated; and further, that for a period of more than twenty years prior to the filing of the petition, a public highway had been authorized and dedicated, and had been kept up by the counties of Titus and Red River, which crossed the stream at the point designated in his charter; and that, at the November term, 1850, of the Commissioners' Court of Titus county, there was a charter granted to one John Becknell, for a toll-bridge, which was built and kept up by said Becknell until the expiration of his charter, which was limited to ten years.   Said bridge was built across the stream, and formed a part of the public highway at the McCrury Crossing, and that said Becknell never obtained a renewal of his franchise, nor has any been granted

to any other person or persons, except that granted to him and his associates by special act of the Legislature, passed April 12th, 1871; and that the bridge built by Becknell, and kept up by him as a toll-bridge, has long since been suffered to fall into decay, and is no longer used by the public as a means of crossing the stream.

The appellant also denies every charge of trespass upon the lands of the appellees; and having fully answered the petition, the court refused to dissolve the injunction. The case is appealed to this court.

The opinion of the district judge is copied into the record, and shows the ground assumed by the learned judge, in deciding the case. He evidently places his decision upon the authority of Williams v. New York Central R. Co., 16 N. Y. Reports. We do not think this case, although good law, can have the slightest application to the case at bar. Doubtless, had the Legislature, by the act of April 12th, 1871, imposed any new servitude upon the lands of the appellees, they, being the undoubted owners of the fee, would, under our Constitution, be entitled to compensation in money for their land, before the appellant would have a right to construct a bridge under the charter granted to him and his associates.

Where a railroad takes the place of an ordinary road-bed, the current authorities hold it to be a new servitude, and before the State, exercising its right of eminent domain, can impose such new servitude, the owners of the fee may demand compensation. But the appellant does not propose to build a railroad on the bed of the old county road, nor to do anything more than bridge the stream which intersects the road, and thus make his bridge part and parcel of the common highway, for which the public have long since gained an easement.

The Legislature is, in a proper sense, the guardian of the public, and there can be no doubt of the right, power, and duty of that branch of the government, as well as every other branch, to improve and promote the public interest, wherever the same can be done without the violation of private rights.

The owners of the fee in the land long since dedicated to the public use, have no better right to interfere with the public easement than any other person would have ; and if the Legislature had done no more than grant the appellant the right to improve, and render more serviceable to the public the right of travel thus acquired, they have only exercised their legitimate power, and one of which the appellees have no right to complain.

It is not beyond the power of the Legislature to revoke a license to keep a ferry, or to impair a ferry privilege by granting a charter to build a bridge where ferries have been kept. If it were, there would be but little chance of a country improving its facilities for traveling, or doing away with primitive expedients by more safe and commodious means of crossing the streams of a country. The man who had a right to keep a flat-boat ferry, granted perhaps, at a time when it was a great public benefit to have it, might hold populous communities, large towns and cities, in very vassalage to his ferry, and utterly prevent the public from resorting to other modes of crossing the stream ; but fortunately the right of eminent domain is reserved to the States, and private property may be condemned to public use.

It is true, as it should be, the right of the owner must be respected, and he must be paid in all ordinary cases for his property. But in this case it is admitted that, since the year 1850, the public have had and enjoyed the use of a highway crossing the Sulphur at the point where the appellant now proposes to build his toll-bridge, and the presumption is that the easement is long since unincumbered by private rights.

We think the constitutional right of the Legislature to grant the franchise in question, can no longer be doubted. Mr. Angell, in his work on Highways, paragraphs 40 and 41, says : " A public bridge being a highway, it follows that those prin- " ciples of the common law which relate to highways in gene- " ral are alike applicable to public bridges ; but, although the " principles. are the same, yet, from a difference in the nature " of the respective objects of their observation, their reduc-

"tion to practice in the one case varies from that of the
" other.

" A common way may, with the consent of the proprietor,
" be at once subject to general user, without any antecedent act
" to bring it into existence; but a bridge must have been
" erected before it can be traversed; and this distinction is the
" foundation of all the difference between the two cases.

" The term *highway* does not import a bridge; and in any
" case where there is an occasion to notice any of the differences
" which exist between highways generally, and bridges, it is
" indispensable that the difference should be marked by terms
" appropriate to each. So that, if a party is to be charged with
" neglect to build or repair a bridge, it must be by the term
" ' bridge,' which alone describes such a structure."

The only comment necessary to be made on the text of the
learned author, in its application to the case at bar, is this:
The antecedent act necessary to a dedication of the highway
in question, and the privilege of erecting a toll-bridge at the
McCrury Crossing, is found in the proceedings of the Com-
missioners' Court at the November term, 1850, wherein is not
only found the dedication of the road, but the grant of a
charter to John Becknell, to erect and keep up a toll-bridge
upon it for the limited term of ten years.

But the learned author already quoted from proceeds to say:
" No State Constitution, it is believed, gives the Legislature in
" terms a right to make bridges, but such power has always been
" exercised, and no one doubts the legislative power to make
" such grants. An act of the Legislature, authorizing the
" erection of a bridge over navigable water within the limits of
" the State, is clearly constitutional."

And here reference is made in the notes to very numerous
authorities running through most of the older States. The
author makes a comment upon the argument of counsel in
the case of the Commonwealth *v.* Breed, 4 Pick., 460, where
it was objected that the grant to build the bridge was upon the
petition and for the benefit of a single individual; to which

26

the court in reply said: "This was doubtless true; and it was "also true that many other enterprises had originated in "motives of private gain, which had resulted in great public "improvements."

This idea is germane to our case. The appellees claim a right to a ferry privilege, and insist that this privilege is valuable to them, and that they ought not to be deprived of it by the Legislature granting to another a right which must impair the value of their privilege. This is an argument which the Legislature doubtless would have considered unanswerable, if no other rights or interests than those of the parties to this suit were in question. But the Legislature doubtless considered that the public had a right to have the streams bridged and the highways improved in the most effectual manner consistent with the rights of individuals. An easement having been acquired by the public in a road crossing the Sulphur at the point in question, not only for a road but for a bridge, and no new servitude being imposed upon the dedication, the riparian owners of the stream have no right to interfere with the construction of a toll-bridge at the point indicated. It may be argued that, because the bridge is to be a toll-bridge, that this in itself imposes a new servitude; but this is not true in law or in fact. A toll-bridge has been kept for a term of years across this stream at the place where it is now proposed to build another. A toll-bridge is, to all intents and purposes, in this case, a part of the public road. Ordinary roads are improved and kept up by some system of taxation. The Legislature, by granting the right to individuals, on condition of their building and keeping up a road or bridge, but changes the character of the tax. But every man who pays his toll upon a toll-road or bridge, has as unrestricted and unqualified a right to travel the road or bridge, as if it were free from toll, and he paid his tax in the ordinary way.

Were we disposed to present authorities in support of this opinion, in numbers such as might be brought forward, our opinion would assume the volume of a compila-

tion. A few of the leading authorities only will be referred to. The case of Chagrin Falls Plank Road Company *v.* Cane, 2 Ohio State, 419, is a remarkably well considered case, decided in an opinion delivered by one of the ablest jurists of that State. It announces the same doctrine, though much more elaborately stated, which is laid down by the Supreme Court of New York in the case of Benedict *v.* Goit, 3 Barb., 459, and in the case of Commissioners of Highways, 16 Barbour, 337.

In the Ohio case it was held that the interest of the public, in a highway under a perpetual easement, might, in the discretion of the Legislature, be transferred, without any money equivalent, to a plank-road company—the latter still being a public highway, and subject to the same uses and purposes as under the former dedication ; and in such instances the corporation becomes the assignee of the public.

In the case referred to in 16 Barbour, being very similar to the Ohio case, the court says, where a plank-road or a turnpike is constructed along a highway, the company succeeds to the rights and powers of the commissioners of highways.

In the case in 3 Barbour, the court hold that a turnpike is a highway, and the Legislature has power to construct and control the highways in such mode and manner as in their judgment may be required ; and the interest of the turnpike company in the easement is that which the public before had.

It can scarcely be denied, that the Legislature would have the right to cause a free bridge to be built across the stream here in question. Is the power to grant to individuals the right to construct a toll-bridge more questionable ? We think not. Redfield, in his work on Railways, Vol. I., pp. 297 and 298, discussing analogous questions to that presented in this case, says : "The decisions are contradictory in regard to the "right of a railway company to lay its track along a common "highway, without making additional compensation to the land "owners adjoining such highway. In some of the earlier cases "upon this subject, it seems to have been considered that, under "such circumstances the land owners were entitled to additional

" compensation, when the land was converted from a common " carriage-way to a railway."

The reason given for these decisions by the learned author is certainly a good one—that the owner's entire interest·should be assessed at once, and this could not be understandingly done unless the use to which it was applied were known to the assessors.

Perhaps an additional reason worthy of respect might be given, at least in some of the States, where the commissioners are allowed to consider benefits resulting to the land owners, and off-set them against damages. The land owners might be greatly benefited by an ordinary highway, upon which every man may travel in his own vehicle, which, if changed to a railway, compels the public to travel in the mode provided by the company. There is, indeed, in such cases so essential a change in the servitude, that in our view the original servitude should be held to be abandoned, and the rights of the owner in fee to revert.

But the same learned author, in Vol. I., page 304, says it was long since settled that the land owners were not entitled to any additional damage by reason of any alteration in the construction of the highway, or in applying it to the use of a turnpike road where toll was paid, this being but a different mode of supporting the highway; of which the land owner had no just cause of complaint, since it did not materially alter the use of the land, and the same rule has now been pretty extensively extended to improvements in erecting railways along the streets and highways. The true principle undoubtedly is, that if the use is substantially as that of an ordinary highway, no additional compensation can be required.

We are of opinion, that the court below misjudged the law of this case, and that the injunction should have been dissolved. It is therefore dissolved by the judgment of this court, and the judgment of the District Court is reversed.

Reversed.