## R. B. HUDSON ET AL. V. CUERO LAND AND EMIGRATION COMPANY.

1. PUBLIC BRIDGES—FERRIES.—The establishing and maintaining of public bridges and ferries where public roads cross navigable streams, lakes, or bays, has always been held in this State to be a franchise, subject to the regulation and control of the Legislature, or of the municipal authorities to which it has been committed by the Legislature.

2. SAME—RIPARIAN RIGHTS.—Preference is given by the statute, in granting such franchise, to the owner of the land on the bank of the stream, lake, or bay across which such ferry has been established, upon his making application and complying with the statutory conditions.

3. SAME.—This preference is merely a statutory preference, springing from public policy, and subject to legislative discretion and control.

4. SAME.—The riparian owner has no greater or better right to exercise the franchise of keeping a public ferry than any one else, beyond that growing out of the general laws of the State regulating ferries.

5. SAME.—The Legislature may, therefore, repeal the statute giving the preference.

6. SAME.—If the grant of such franchise is to one not the owner of the land, and it becomes necessary to enable such grantee to exercise the franchise for the public good, to use or take the property of the riparian owner, or if a new or different servitude is imposed in furtherance of a public purpose, such grantee would be required to make adequate compensation to the owner for such property so taken.

7. STATUTE CONSTRUED.—The Legislature had ample authority, and did by special act of May 7, 1873, confer upon appellants the exclusive franchise for the length of time and to the extent indicated in said act of constructing and keeping a pontoon bridge over the Guadalupe river, at the town of Clinton, in De Witt county.

8. SUFFICIENT DESCRIPTION.—The description in a charter to erect a bridge " at the town of Clinton," is sufficiently answered where a public ferry had existed at the point in question for more than thirty years, generally known and spoken of as the ferry on the Guadalupe river, at the town of Clinton, (although not within the limits of the town,) where the travel to and from Clinton was accustomed to cross the river.

9. CONSTRUCTIVE REPEAL.—In view of the great similarity in the privilege of passing the public over a stream by means of a ferry and pontoon bridge, it seems that the act granting a charter to make and keep a bridge would operate as a *pro tanto* repeal, or limitation of the general power conferred upon the County Courts to establish ferries.

10. POWER OF COUNTY COURT TO ESTABLISH FERRIES.—In determining whether a particular ferry shall be established or maintained, the County Court should act with reference to the public interest ; and when the Legislature had granted the privilege of having a pontoon bridge, it was in the discretion of the County Court to determine that the public good did not require a ferry at or near the same place.

11. PRESCRIPTION.—That a river-crossing upon a public road has been used for over thirty years, is amply sufficient to authorize the presumption that the right to it had been granted to, or otherwise acquired by the public.

12. SERVITUDE.—The erection, by authority of the Legislature, of a toll-bridge in the highway across a stream where a ferry had been previously operated by the riparian owner, imposes no new servitude upon the land.

13. FROM AN ACT OF THE LAW NO ACTION LIES.—The riparian owner has no cause of complaint against a party erecting a bridge, with consent of the County Court and by authority of a special act of the Legislature, in the public highway, by reason of his ownership of the lands on which the bridge is erected or fastened.

APPEAL from De Witt. Tried below before the Hon. D. D. Claiborne.

Previous to the 25th of December, 1871, it was agreed between Gustave Schleicher, Fletcher S. Stockdale, and Charles M. Terrill, that they would unite and form the company or corporation afterwards formed and called the "Cuero Land and Immigration Company," having its domicile and principal place of business in De Witt county. Under this agreement, Schleicher, acting for himself and his two associates, purchased from the administrator of J. O. Wheeler's estate the league of land on which the town of Cuero was afterwards built, to wit, the Valdez y Gonzales league, fronting upon the Guadalupe river, opposite the town of Clinton, and including the ferry-landing at that point, on the east bank of the river. He also purchased from Kelso and wife thirty-three acres on the west or Clinton side of the river, and including the ferry-landing on that side. One of the purposes of the contemplated company was to operate the ferry at this point; and for the purpose of securing for the company, as owners of both banks, the exclusive right of ferriage at that point, Schleicher gave $900 for the said thirty-three acres, which, he supposed, would not sell for more than $50 to $100, if they did not include the ferry-landing. Schleicher also purchased several other tracts of land for the use and benefit of the contemplated company.

On the 25th of December, 1871, a charter, prepared under the provisions of the act of the Legislature, entitled "An act concerning private corporations," approved December 2, 1871, was signed and acknowledged by said Gustave Schleicher, Fletcher S. Stockdale, and Charles M. Terrill, and on the 7th of January, 1872, it was filed in the office of the Secretary of State. By this charter the contemplated company was formed, under the name of the "Cuero Land and Immigration Company."

On the 10th of February, 1872, Schleicher conveyed all these lands to the said company.

One of the purposes for which the company was formed, as set forth in its charter, was the "construction and maintenance of a bridge across the Guadalupe river, in De Witt county, near the town of Clinton;" another was "to establish and maintain a ferry across the Guadalupe river, near Clinton, in De Witt county." At this point a ferry had been kept up and operated for many years, by J. O. Wheeler, who owned the league aforesaid, which included the ferry-landing on the east side of the river, and who rented the landing on the west side. After Wheeler's death, his administrator leased the landing, boat, tackle, &c., to sundry persons, and for the years 1869 and 1870 he leased them to the appellant, Hudson, and one Gay. In the beginning of the year 1871, he sold the boat, tackle, &c., to said Hudson, and gave him the right to use the landing on the east bank till the end of that year. In April of that year, the administrator sold the league of land to Schleicher, as aforesaid, but reserved for Hudson the right to use the ferry-landing on the east bank till the end of the year 1871.

Hudson operated the ferry during the year 1871. At the end of that year, he obtained from the County Court of De Witt county a license for a ferry at that point, for the year 1872, without showing that he was the owner or lessee of either bank, or that he had any license from the owners. In the same way he obtained license for the year 1873. These licenses seem to have been granted without opposition, or any question being raised in regard to them. At this time, (in 1872 and beginning of 1873,) the members of the Cuero Land and Immigration Company had become associated with some others in a bridge company, and were engaged in building, about two miles above the ferry-site, the bridge across the Guadalupe that was contemplated by the charter of the first-named company; and it is probable that for this reason they made no opposition to the grant of license to Hudson, but were willing that he might use the banks on their land until they should be ready to establish the ferry there them-

selves, for it appears that they had built a ferry-boat, and were using it in the construction of the bridge, and intended, upon the completion of the bridge, to drop this boat down to the ferry-site and operate the ferry themselves.

May 7, 1873, Hudson, Hamilton, and Boston, obtained from the Texas Legislature a special act or charter, empowering them to " erect a pontoon bridge over the Guadalupe river at the town of Clinton, in DeWitt county," with the right to charge specified tolls—the right to continue fifteen years, with a provision in the act that no other " person or corporation shall construct a bridge within one mile above or below, during the continuance of this charter." Hamilton and Boston, respectively, transferred their right or interest under the act to Brown and Grafton. In the summer of 1873, Hudson and his associates began to prepare to place their proposed pontoon in the river at the ferry-site, where Hudson was operating the ferry; and at the July Term, 1873, of the De Witt County Court, they applied for an order of court authorizing them to place a pontoon bridge in the river, at the point where the ferry was kept by Hudson, and to fasten the ends of the bridge in the two public highways leading from the ferry.

The Cuero Land and Immigration Company now moved in opposition. As owners of both banks of the river at the ferry-site, they proposed to apply for ferry-license for themselves; but understanding, informally, that the County Court was of opinion that license could not be granted to a corporation, but only to an individual, they made a conveyance of the land, on both banks of the river, to Quincy Davidson, who was associated with them as a member of the bridge company. Previous to this, it had been agreed, by the directors of both companies, that the ferry should be run in the interest of the bridge company, and this conveyance to Davidson was to enable him, as the holder of the Land and Immigration Company's right to the banks on both sides, to obtain the license for the ferry, and to operate it for the benefit of

the bridge company. When the application of Hudson and his associates was made, Davidson immediately filed his protest against the order applied for by Hudson and his associates. He represented that he was the owner of both banks of the river; that he was prepared to transport all persons and vehicles across the river at that point upon a ferry-boat; that, if the public interest required it, he would establish a bridge of boats, to be used at low water, and have a ferry-boat in readiness for use whenever the drift wood and high water made it dangerous or unsafe to keep up a floating bridge; and he protested against the proposed order as an invasion of his rights.

At the same term, (July, 1873,) Davidson made formal application to the County Court for license to establish and maintain a ferry at the point in question, representing that he was the owner of the land on both banks, and that he was ready to give bond, and to bind himself to transport "all persons traveling in ambulances, carriages, buggies, on horseback or on foot, who reside in De Witt county, at half the rates that may be fixed by the court, provided such rates are not lower than those now imposed on other ferrymen in De Witt county."

Hudson et al. filed a counter protest, and insisted on the authority granted by act of May 7, 1873.

The County Court rejected Davidson's application. After the adjournment of the court, to wit, July 30, 1873, Davidson applied to the presiding justice of the court for temporary ferry-license to run till next term of the court; which application was refused. At its August Term, 1873, the County Court made an order, to the effect that Hudson and his associates be authorized to place their pontoon bridge in the river at the site of the ferry which Hudson had been operating, and to fasten the ends thereof in the public road on each side of the river.

The court having refused license to Davidson, and the object of the conveyance to him having failed, he reconveyed or

released the land to the Cuero Land and Immigration Company, August 15, 1873. The same day, this company applied to the presiding justice of the County Court for temporary license to operate a ferry at a point immediately above the ferry operated by Hudson, representing that they were the owners of both banks, and were fully prepared, with a good boat, &c., to maintain a ferry. This application was refused. About the same time, they filed an application to the September Term of the County Court for regular license, showing the same grounds for their application. This application was also refused. Previous to this, however, (to wit, August 11, 1873,) the company had given notice to Hudson and his asso- ciates that they owned the land on both sides of the river at Clinton, and forbade the construction of a pontoon bridge there, and forbade the using of any part of their land for such purpose.

Hudson and his associates having constructed their pontoon, and placed it in the river at the site of the ferry, fastening the ends in the public road—that is, upon the ferry-landings, at each side—on the 18th of August, 1873, the Cuero Land and Immigration Company instituted this suit. The petition alleges all the foregoing facts, so far as they are material, and that Hudson and his associates were using their pontoon, to the great damage of plaintiffs, and prayed for injunction against Hudson and his associates; for *mandamus* to the presiding justice of the County Court for a temporary license; and further prayed that, upon final hearing, their rights, as riparian proprietors, to establish and maintain a ferry at that point, might be established, and that a peremptory *mandamus* might be issued, commanding the County Court to issue to them a regular license, upon their showing that they were the owners of both banks, and were prepared, with boat, tackle, &c., for operating a ferry suitable for the public accommodation, and that they were ready to give the prescribed bond.

The defendants answered, setting up the rights they claimed

under the act of May 7, 1873, and the order of the County
Court; alleged that the highway leading to the ferry had
been established or used for twenty years; that a ferry had
been kept there for twenty years; that there was no opposi-
tion to the license granted to Hudson for 1872 or 1873; that
Hudson held license, and was under bond to operate the ferry
till the end of 1873; and further alleged that he had been at
great expense in building a new ferry-boat, and that he and
his associates had been at great expense in constructing their
pontoon bridge.

August 18, 1873, an injunction was granted and prelim-
inary *mandamus* awarded.

August 21, 1873, the injunction was dissolved, by the judge
at chambers, so far as the use of the pontoon bridge was con-
cerned, but upon condition that the defendants give bond in
$5,000, to respond in damages, &c.

December —, 1873, plaintiffs filed an amended petition,
alleging $10,000 damages, by reason of defendants using the
pontoon bridge, and charging that defendants had not only
fastened the ends of their pontoon in the public road upon the
land of the plaintiffs, but had entered upon plaintiffs' premises,
outside of the public road, and had attached their pontoon
thereto, whereby they were damaged in $5,000. Plaintiffs
also alleged that, since the *mandamus* was granted, they had
applied for ferry-license, both to the presiding justice and to
the County Court, and that by both it had been refused.

Defendants, by amended answer, denied that they had en-
tered upon or used any of plaintiffs' lands outside of the road;
denied that the land where the pontoon was fastened was the
property of the plaintiffs, and alleged that the Guadalupe was
a public river, subject to the control of the Legislature. De-
fendants further amended their answer, and alleged that the
ferry-license to Hudson for 1873 was granted with the knowl-
edge of plaintiffs, and without objection; that he built a new
ferry-boat, at the cost of $900, in 1872; that the defendants
had constructed their pontoon at the expense of $3,935.23,

exclusive of the ferry-boat built by Hudson; that the plaintiffs had knowledge of the building of the pontoon, and the obtaining of license by Hudson for 1873, and did not object; and they prayed, if judgment should be given against them, that the plaintiffs might be compelled to take the boats composing the pontoon at their original cost, to wit, $3,935.23.

At the trial, there was a verdict for the plaintiffs, with nominal damages, and a decree was rendered enjoining the defendants from using the said pontoon, and requiring them to remove it; also enjoining them from constructing or operating any other pontoon where the land on both banks, or either, was owned by plaintiffs, as described in the petition : also enjoining them from operating a ferry at the said crossing of the river, and also directing a *mandamus* to the County Court, commanding that court to issue a ferry-license to the plaintiffs. From this decree the defendants appealed.

*H. Clay Pleasants,* for appellants.

*Phillips, Lackay & Stayton,* also for appellants.

*Stockdale & Proctor* and *Glass & Callender,* for appellee.— The statute recognises in the owner of both banks of a navigable stream "the sole and exclusive right of ferriage at such place;" and, while the law supervises this right, through the County Court, and requires that license shall be issued and bond given, in order that the public may be accommodated and protected, it does not take away the right, nor attempt to divest it. In our view of the law, the County Court has a discretion to decide whether there shall be a ferry established or not at a given point; but if it is established, the owner of both banks has a right to the franchise, and this right cannot be taken away from him, except by his consent or upon his refusal to exercise it.

In the case of Dunlap *v.* Yoakum, 18 Tex., 584, this court

said, of Yoakum, that, "as owner of the land, he was, by law, entitled to the privilege of keeping a public ferry across the river, provided one was established upon and fronting his lands." And, in the same case, it was decided that he was entitled to damages against one who entered upon his land and deprived him of this ferry-right; and this right, conceded and confirmed by our statute to the riparian proprietor, is only the right which is recognized by the general law of the United States on this subject. (Dutton *v.* Strong, 1 Black, 25; Yates *v.* Milwaukee, 10 Wall., 504.) In the last-mentioned cases, Judge Miller, delivering the opinion of the court, says, of an owner of a lot fronting upon a river, that, whether his title " extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and, among those rights, are access to the navigable part of the river from the front of his lot; the right to make a landing, wharf, or pier, for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public." And again, in the same opinion, he says: "This riparian right is property, and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

A ferry having, then, been established at the point in controversy, and the plaintiffs being owners of the land on both banks, they had a vested right in the ferry franchise, or right to keep a public ferry at that place, which right, like other rights of property, could only be divested by due course of law, or taken for public use under legislative authority, and upon due compensation made.

If the charter granted to Hudson and his associates, by

special act of May 7, 1873, is to be construed as being intended to take away this right of the plaintiffs, and to give it to the defendants, or to authorize the defendants to invade and destroy it, then that act is unconstitutional and void.

It could not have been intended that the defendants should have the ferry-landings, or any other part of the land of the plaintiffs, condemned as a site for their pontoon bridge; for there is no authority in the act to have anything whatever condemned for the use of that pontoon. The only reasonable construction is, that the Legislature expected the grantees of that charter to buy land for a site for their bridge, or locate it upon the lands of others, by consent and contract.

They are authorized to construct a pontoon across the river "at Clinton;" but no point is designated, and the town of Clinton does not actually extend to the river. Anywhere upon the river, in the neighborhood of Clinton, would be, with reasonable certainty, the locality called for by the law; and the court, we submit, will not assume that the Legislature meant the pontoon should be located on the ferry-site of the plaintiffs, and in violation of their rights, when the language of the act does not so declare. Every reasonable intendment will be assumed, to avoid the conclusion that the Legislature intended an invasion of private rights.

It seems to be supposed by appellants' counsel, that because there are public roads leading to the ferry, the County Court, by virtue of their control over public roads, may destroy the ferry-right of the plaintiffs, and take the ferry-landings, which are upon the plaintiffs' land where these roads strike the river, and turn them over to the defendants, to be used as fastening places for their pontoon; and thus enable the pontoon to usurp the place of the ferry and destroy the ferry-right. We suppose there are few public ferries to which public roads do not lead—certainly no ferries that are of much profit to those who operate them; and if it be the law, that the control of the public roads that lead to the ferry gives the County Court such control over the ferry-landings

that they can take them from the owners of the land and the holders of the ferry-right, and give them to the owners of a pontoon bridge, they can just as well turn them over to some other ferryman who claims to have a bigger boat or better tackle than the owner and operator of the ferry; for, if they have the power to do what they have attempted in this case, there is no limit to that power, except their own discretion. But we insist, that it is not within the power of the Legislature, even by direct enactment, to take our property or appropriate our rights, even for public use, without due compensation; much less is it in the power of the County Court, who can show no semblance of legislative authority to that effect, to seize our rights and property for, and convert them to the benefit of, private parties; and it makes no difference whether those rights and property are situated at the ends of public roads or elsewhere.

It is insisted that these public roads have been condemned, or dedicated to public use, and that the use of the road, as a place for fastening the ends of the defendants' pontoon, is no additional servitude upon the land.   While we are not ready to concede that in such a case it would be no additional servitude, we waive discussion of the point, because we think it immaterial.

It is apparent, from the evidence in this case, that the ferry has been operated at that point, and roads that lead to it have been used, for about the same length of time.   There is no evidence of any condemnation of land for a public road, nor any formal dedication for that purpose; but the owners of the land, whose title the plaintiffs hold, have always held the ferry-right and operated the ferry, by themselves or their lessees, and these roads have always led through these lands to the ferry.   Doubtless they were first opened or used to enable the public to reach the ferry, and have been so used ever since.   To pretend that, by permitting or encouraging such use of a road through their grounds to reach the ferry, the owners have so dedicated the very

ferry-landings to the public; that those landings may be taken away from them and given over to the use of a pontoon that destroys their ferry and usurps its place, strikes us as nothing less than a preposterous proposition.

To cite instances in which turnpike roads or plank roads have been constructed upon the site of ordinary public roads, and it was held that the owners of the fee were entitled to no additional compensation for the change, is not at all to the purpose of this discussion. In such cases no injury in fact is done to the owner of the fee, but frequently a benefit conferred. He is divested of no right; no valuable franchise is wrested from his hands and devoted to the use of another; no source of revenue and support is cut off from him and turned into the pockets of his grasping neighbors. The cases are not alike. There are no elements of comparison in them.

Equally fallacious is the argument that because the Guadalupe is, not by nature, but by statute, "a navigable stream" at Clinton, therefore the public have a right to use its banks, and consequently the owners can have no exclusive right to ferry privileges, ferry landings, &c. We need only say that this argument is directly in the teeth of the statute, which gives this "sole and exclusive right" to those who own both sides or banks of a "navigable stream," as well as of other enumerated waters.

MOORE, ASSOCIATE JUSTICE.—The establishing and maintaining of public bridges and ferries where public roads cross navigable streams, lakes, or bays, and the charging of toll or ferriage for passing or carrying travelers over or across the same, has always been held in this State to be a franchise, subject to the regulation and control of the Legislature, or to the municipal authorities to which it has been committed by the Legislature. (See Paschal's Dig., arts. 632, 1229, 3841, 3860.)

In general, preference is given by statute, in granting

such franchise, to the owner of the land on the bank of such stream, lake, or bay, across which a public ferry has been legally established, upon his making due application for the same, and complying with the terms and conditions prescribed by the statutes regulating and authorizing its grant. But this preference is not a matter of absolute right, by reason of riparian ownership, but merely a statutory preference, springing from public policy, and subject to legislative discretion and control. If the privilege of establishing and maintaining a public ferry was a thing of absolute and inherent right in the owner of the land, it could not be said to be a franchise, but would be an easement or corporal hereditament, attached to and dependent upon such riparian ownership. It would be private or individual property, within the protection of the Constitution, and could only be taken or appropriated to public use upon the payment of just and adequate compensation to the owner. If, on the other hand, as we regard it, the riparian owner has no greater or better right to exercise the franchise of keeping a public ferry than any one else, beyond that growing out of the general laws of the State regulating ferries, he unquestionably has no cause of complaint, if the Legislature sees fit to repeal the statute, or revoke the preference conferred by it upon him. If the franchise or privilege of keeping a public ferry is granted to some one who does not own the land, and it became necessary, to enable such grantee to exercise the franchise for the public good, to use or take the property of the riparian owner; or if thereby any new or different servitude is imposed upon it from that to which it was previously subjected, in furtherance of a public purpose or use,—he would unquestionably be required to make adequate compensation for the same to the owner.

Applying these general principles to this case, it must be held, that the Legislature had ample authority, and did, by the special act of May 7, 1873, confer upon appellant and his associates the exclusive franchise, for the length of time and

to the extent indicated in said act, of constructing and keeping a pontoon-bridge over the Guadalupe river, at the town of Clinton, in De Witt county.

It is said, however, by appellee, that while this act authorizes appellants to erect said bridge across the Guadalupe river, at the town of Clinton, it is ineffectual and nugatory, by reason of the fact that the corporate limits of said town do not extend to the bank of the river, or include the ferry-right in question where such bridge has been placed.   To this, it might suffice to say, that no such objection seems to have been taken in the court below, and therefore but little if any consideration should be given to it here.   Aside, however, from the fact that this objection seems to have been an afterthought, it clearly appears from the evidence that a public ferry had existed at the point in question for more than thirty years, which has been generally known and spoken of as the ferry on the Guadalupe river, at the town of Clinton.   This is the crossing to which the public roads leading across said river to and from Clinton converged.   And in appellee's application to the County Court for a license to keep a ferry over said river, the *locus* is also designated as at the town of Clinton, "at a point immediately above the ferry-site of R. B. Hudson," &c.

It was unquestionably the intent and purpose of the Legislature, in granting to Hudson and his associates the franchise of erecting a pontoon bridge over said river, to secure to the public greater facilities for crossing said stream at said town of Clinton; and in view of the fact that this was the point where the travel to and from Clinton was accustomed to cross it, and that the ferry at this point had been long known and habitually spoken of as the ferry or place of crossing the Guadalupe river, at the town of Clinton, it appears to us quite evident that it was the point in the mind of the Legislature when said special law was enacted, at which it was contemplated said bridge was to be constructed.

It may be said that, although the exclusive right of erect-

ing a pontoon bridge on said river, within the distance named therein, is given by said special act to appellants, said act does not forbid the licensing of public ferries within any distance of the bridge. We are not disposed to controvert this proposition; and certainly not, if such ferry should be established or authorized by the immediate authority or direct and unequivocal sanction of the Legislature. But in view of the evident object and purpose of this special act, and the great similarity in the privilege of passing the public over a stream by means of a ferry and pontoon bridge, it may, we think, be seriously doubted whether said special act does not operate a *pro tanto* repeal, or limitation upon the general power conferred by previous statutes upon the County Court to establish ferries. But whether this is its proper construction or not, makes, in our opinion, no difference. For if, as we have said, the riparian proprietor has no absolute and vested right to a ferry franchise, but a mere statutory preference, when a public ferry is established, to a license to use and operate it, it certainly cannot be insisted that he may demand, as a matter of right, that a ferry shall be established by the County Court over every stream where this may be properly done, to enable him to avail himself of the privilege given him by the statute when a ferry is established. In determining whether or not a particular ferry shall be established or maintained, the County Court unquestionably should act with reference to the public interest, and not through regard to mere private or individual benefits. And if the Legislature supposed that the public interest would be promoted (as we must infer it did) by granting appellants the exclusive privilege of having a pontoon bridge over said river, within the limits indicated in the act, we think it cannot be denied that it was within the discretion of the county to say that the public good would not be advanced by establishing a public ferry at the town of Clinton, immediately contiguous to appellants' bridge.

It is also said by appellee, that said special act does not au-

thorize the condemnation of private property, and as it is the owners of the land on both banks of the river, appellants have no authority or right to erect ·their bridge at the point where it has been placed, without and against their consent. It appears, however, from the statement of facts, that a public road and ferry had been established to and across the river, at the point where this bridge is placed, for more than thirty years before the trial of this case in the District Court, and long before the owners of the land were given by statute the preference of keeping the ferry, and before it is shown by the record the State had ever parted with the title to the land.  But whether the land belonged to private parties or not, where the ferry was established, and the roads leading to it were originally laid out, the length of time during which the public have been in the exercise of the privilege of a highway across said river, and over said land, is amply sufficient to authorize the presumption that the right to it had been long since granted to or otherwise acquired by the public.  It has been heretofore decided by this court, (Jones *v.* Keith, 37 Tex., 394,) that the erection, by authority of the Legislature, of a toll-bridge in the highway across the stream, where a ferry had been previously operated by the riparian owner, imposes no new servitude upon the land, and entitles the owner of it to no compensation.  If so, appellee has no cause to complain that appellants' bridge has been erected with the consent of the County Court, in accordance with the intent of the Legislature, in the public highway, even if appellee owns the land to which it is fastened.

The decision of the points to which we have adverted necessarily leads to a reversal of the judgment, and obviates, as we think, any necessity for passing upon the objections made by appellants to the testimony offered by appellee to prove its alleged title to the land on the banks of the river, where appellants' bridge has been erected.

REVERSED AND REMANDED.